IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joan Cassidy, : 
                Petitioner : 
          : 
         v. : 
          : 
Presbyterian Medical Center of the : 
University of Pennsylvania Health : 
System (Workers' Compensation : 
Appeal Board), :   No. 1023 C.D. 2023
         Respondent :   Submitted: May 6, 2025

BEFORE:   HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON               FILED: June 2, 2025

Joan Cassidy (Claimant) petitions for review *pro se* from the July 28, 2023, order of the Workers' Compensation Appeal Board (Board). The Board affirmed the December 16, 2022, order of the workers' compensation judge (WCJ), which granted Claimant's claim petition for workers' compensation benefits as of May 18, 2021, and terminated benefits as of December 20, 2021. Upon review, we affirm.

## I. Factual & Procedural Background

On June 22, 2021, the Presbyterian Medical Center of the University of Pennsylvania Health System (Employer) issued a notice of temporary compensation payable (NTCP) acknowledging that while working on May 18, 2021, Claimant was

in a parked car hit by another car and sustained work-related strain/contusion injuries to the right neck, shoulder, thigh, and knee. Certified Record (C.R.) at 426-27.[1] The 90-day NTCP period began on May 19, 2021, and was to end on August 17, 2021. *Id*. On August 16, 2021, Employer issued a notice stopping temporary compensation (NSTC) and a notice of denial (NCD) asserting that Claimant did not sustain a work-related injury. *Id*. at 428-31. On August 17, 2021, Claimant filed a claim petition asserting that as a result of the incident, she sustained multiple injuries, including a traumatic brain injury, and seeking ongoing benefits. *Id*. at 7-9. Employer issued an answer denying Claimant's allegations, and litigation ensued. *Id*. at 14-16.

Claimant first testified in an October 18, 2021, deposition. C.R. at 112. At the time of the injury, she was 59 years old. *Id*. at 116. She had worked for Employer full time for over five years as a traveling licensed practical nurse (LPN). *Id*. at 117. Her duties included various types of wound care; she kept supplies in her personal car, had an Employer-provided laptop computer that she took with her for medical records, and she would call doctors with necessary medical updates. *Id*. at 117-18. She had six to eight appointments per shift. *Id*. at 119.

According to Claimant, on the date of the injury, she was driving between appointments and pulled over to the roadside to call back a doctor about a patient. C.R. at 120. A car being chased by a police car came towards her going the wrong way on the street and driving very quickly and erratically. *Id*. It hit Claimant's car on the driver's side where she was at the time; the air bag deployed and hit her head. *Id*. at 122. An ambulance took her to the emergency room (ER). *Id*. at 123. She did not lose consciousness. *Id*. at 143. The next day she had pain in her right side, including the shoulder, back, knee and groin area. *Id*. at 124. She

---

[1] C.R. references are to electronic pagination.

began treating at Employer's occupational medicine clinic for her injuries, which soon included cognitive, memory, sleep, and balance issues, headaches, and problems with speech and word-finding. *Id*. at 125-27. The clinic referred her to Employer's neurology department where she was treated with medication, physical therapy, and speech therapy. *Id*. at 126-30. After Employer stopped benefits in August 2021, she could not afford the therapy co-pays but continued treating with the neurology department. *Id*. at 131.

Claimant stated that her cognitive and physical injuries had improved but were not resolved by the date of her deposition. C.R. at 132 & 137-38. She still got headaches and experienced speech issues and memory issues, especially when she had to talk regularly. *Id*. at 132-33. Her ongoing physical and cognitive issues made her unable to return to her job, which required working on the computer, physically working on patients, talking to patients and doctors, and driving regularly, although she can now drive short distances as needed for regular life activities and needs. *Id*. at 134 & 143. She still had problems with stairs, vertigo, memory, long periods of bright light, and depth perception. *Id*. at 139 & 149-51. She did not believe she could return to work even in a sedentary capacity due to her cognitive issues. *Id*. at 157. She had none of these problems before. *Id*. at 135-37. She acknowledged that surveillance video taken of her in August 2021 showed her out at a yard sale, church, a thrift store, and Wawa. *Id*. at 153.

Claimant testified again before the WCJ at a July 6, 2022, hearing. C.R. at 80. She had not returned to work and did not feel she could do so yet, primarily due to her ongoing cognitive issues. *Id*. at 95 & 99-101. She still got headaches and had memory issues, especially when she was "under pressure." *Id*. at 96. She still had trouble with "word[-]finding." *Id*. at 97. She was referred to see a

3

neuropsychiatrist, but had only seen him briefly since Employer cut her health insurance. *Id*. at 98. She had issues with her shoulder, knee, and neck but thought she could physically do her former job if her cognitive problems and headaches were not still an issue. *Id*. at 100-01.

Dr. Andrea Schneider, M.D., Ph.D., testified for Claimant in a January 28, 2022, deposition. C.R. at 245. She is a board-certified neurologist at the University of Pennsylvania (Penn). *Id*. at 251. She has been licensed in Maryland since 2014 and in Pennsylvania since 2020. *Id*. at 313-14. Her work is 80% population-based research on the effects of traumatic brain injuries and 20% clinical, with the clinical aspect including eight weeks per year in Penn's neurology and neurosurgical intensive care unit and half a day per week in Penn's traumatic brain injury clinic. *Id*. at 252-54.

Claimant first came to Dr. Schneider's clinical practice a week after the incident for a telehealth appointment with the practice's nurse practitioner. *Id*. at 262 & 268. Claimant reported headaches and issues with mood, sleep, vision, memory, word-finding, light-sensitivity, and cognitive functions, all of which increased with overstimulation and activities like reading and using screens. *Id*. at 264-66. Dr. Schneider acknowledged the limitations of telehealth in this context in that some "subtleties" can be missed. *Id*. at 269. The nurse practitioner diagnosed a traumatic brain injury based on Claimant's account of the incident and her symptoms and prescribed medication for Claimant's headaches. *Id*. at 269 & 282.

Claimant's next telehealth appointment with the nurse practitioner was on June 25, 2021. C.R. at 272. Claimant reported increased anxiety and word-finding difficulty and ongoing headaches, vision, and memory issues. *Id*. at 273. The nurse practitioner noted Claimant's speech and word-finding issues that day and

referred her for cognitive and speech therapy. *Id*. at 273-74. Subsequent therapy notes from August 2021 reported Claimant's issues with memory and word-finding. *Id*. at 278. The nurse practitioner's last telehealth visit with Claimant was on August 30, 2021. *Id*. at 279. Claimant reported improvement in her various symptoms but stated that she was not recovered yet and had good days and bad days. *Id*. at 280. The nurse practitioner referred Claimant for a neuropsychological evaluation of her cognitive status in order to help establish a formal treatment plan. *Id*. at 281.

Dr. Schneider first personally saw Claimant for a telehealth visit on November 19, 2021. C.R. at 281 & 285. Claimant reported that stresses in her life and occasions of overstimulation worsened her symptoms, which had otherwise generally improved but still lingered. *Id*. at 282 & 286. She no longer needed the prescription headache medication and was using over-the-counter Naproxen as needed. *Id*. Dr. Schneider detected some word-finding difficulty at that time but "everything else by telemedicine was unremarkable." *Id*. at 285 & 288. Dr. Schneider formally diagnosed Claimant with a "traumatic brain injury without loss of consciousness as well as a post-traumatic headache and cognitive sequela" caused by the May 2021 incident. *Id*. at 286 & 290. She acknowledged that the ER records just after the incident reflected an unremarkable CAT scan of Claimant's brain, but stated that this would not rule out a traumatic brain injury, only that immediate surgery was not warranted. *Id*. at 293. She acknowledged that Claimant's traumatic brain injury was in the "mild" category but stated that this was not an indication of the likelihood of full recovery. *Id*. at 295-96.

Dr. Schneider last saw Claimant a week before the January 2022 deposition and noted that Claimant was much improved generally, but opined that Claimant was not fully recovered. C.R. at 292 & 329. Dr. Schneider distinguished

between routine activities of daily living, which a brain injury patient can often do with relative ease, and non-routine activities requiring a higher level of executive functioning, like planning and multitasking. C.R. at 279. According to Dr. Schneider, this was why Claimant did not look impaired on the August 2021 surveillance video. *Id*. at 303. Dr. Schneider did not think that Claimant needed restrictions on driving or other activities, but stated that Claimant should gradually "build up" in these contexts "so that her brain can heal." *Id*. at 298-99.

Dr. Schneider would not return Claimant to work due to the need in Claimant's job for the kind of "heavy, cognitive-load tasks, from multitasking to triaging to dealing with new situations" that Claimant is not yet recovered enough to fulfill. C.R. at 301. She would not return Claimant to desk work, either, because most of those jobs involve extensive screen use, which she did not believe Claimant was yet able to sustain. *Id*. at 332. Dr. Schneider acknowledged that with brain injuries, there may not be objective indicators of impairment and the doctor often must rely on the patient's reports, but in her observations, she did not detect Claimant magnifying or inventing symptoms. *Id*. at 305 & 309.

Dr. Richard Bennett, M.D., testified for Employer in a February 22, 2022, deposition. C.R. at 475. He has been board-certified in neurology since 1980 and has a regular clinical practice seeing about 20-25 patients per week. *Id*. at 479. He saw Claimant for an in-person IME on September 15, 2021, four months after the incident. C.R. at 484. He reviewed the ER records and noted that after the incident, she was discharged the same day and all her tests were normal. *Id*. at 485 & 490. Through August 2021, the records showed that she reported subjective symptoms but her evaluations were generally normal. *Id*. at 491-92. At the IME, Claimant reported that she was able to drive short distances and do things like going

6

to the market. *Id.* at 486. She still got headaches, but their intensity had "diminished considerably." *Id.* at 487. He detected no speech issues and only "minimal symptoms." *Id.* at 489. He performed a basic physical and functional examination and detected no objective signs of neurological impairment. *Id.*

Dr. Bennett detected no cognitive impairment at the IME, during which Claimant participated and gave clear responses to questions; he did not feel that more extensive testing was needed. C.R. at 493, 497 & 503-04. He concluded from his record review, examination, and review of the surveillance video that to the extent Claimant sustained a "very minor concussion" or "post-concussion syndrome" from the May 2021 incident, she had some "lingering subjective complaints" but these were not incapacitating; she needed no further care and could resume her job. *Id.* at 494-96. He disagreed with Dr. Schneider's distinction between routine daily activities like those seen in the August 2021 surveillance video and the duties of Claimant's job; he pointed out that shopping requires driving, finding things in stores where there may be bright light and noise, and calculating prices. *Id.* at 500-01 & 512. In the video, he observed no balance or gait issues and noted that Claimant was not wearing dark glasses to minimize her exposure to bright light. *Id.* at 525.

Dr. Bennett maintained that while Claimant sustained a head injury, she was recovered as of the IME. *Id.* at 501, 505 & 523. He believed that Dr. Schneider's impressions were hindered because she had only seen Claimant through telehealth whereas he had seen Claimant in person, where he could detect any evidence of balance or other physical manifestations of an ongoing brain condition. *Id.* at 502 & 509. He acknowledged that brain injuries do not present objective diagnostic markers like other injuries, but noted that the "vast majority" of these

7

kinds of injuries "resolve or significantly improve" within three to four months and believed that was the case here. *Id*. at 507.

Dr. Richard Schmidt, M.D., testified for Employer in a March 28, 2022, deposition. C.R. at 433. He is board-certified in orthopedic surgery. *Id*. at 437. He saw Claimant for an IME on December 20, 2021. *Id*. at 442. Claimant reported lingering discomfort in her right shoulder, buttocks, thigh, and knee areas. *Id*. at 444. His physical examination of her was objectively normal other than some tenderness she reported in the areas where she told him she still had issues. *Id*. at 445-48. To the extent she sustained physical injuries such as contusion or soft tissue conditions resulting from the incident, she was fully recovered with no need for further treatment or work restrictions. *Id*. at 449-50 & 455. He was not evaluating her for cognitive issues, but noted that he saw and treated many boxers for over two decades as a boxing ring physician and he did not discern any impairment at the IME such as in her gait or ability to participate in the examination. *Id*. at 439-40 & 453-54.

The record also includes the February 10, 2022, neuropsychological evaluation report by Dr. William Gardner, Ph.D., a licensed clinical neuropsychologist; although Dr. Gardner did not testify, Employer did not object to the report's admission into evidence by the WCJ. C.R. at 88 & 391-403. Dr. Gardner wrote that Claimant was referred to him by Claimant's primary care doctor and by Dr. Schneider because since the May 2021 incident, she had been "very jumpy and very anxious and . . . sensitive to noises." *Id*. at 391. Dr. Gardner diagnosed Claimant with a mild traumatic brain injury and post-concussion syndrome due to the May 2021 incident. *Id*. at 393. He did not find her to be fully recovered or able to return to work as of the evaluation. *Id*.

8

The WCJ issued an opinion and order on December 16, 2022. C.R. at 19-29. The WCJ credited Claimant as to her injury but not as to its duration; she credited Dr. Bennett over Dr. Schneider and Dr. Gardner as to the duration of Claimant's injury. *Id.* at 26-27. The WCJ granted the claim petition, concluding that Claimant sustained a disabling minor concussion and post-concussion syndrome from the May 2021 incident; however, the WCJ concluded that Claimant was fully recovered as of Dr. Schneider's December 20, 2021, IME, and terminated Claimant's benefits as of that date. *Id*. at 27-29. On Claimant's appeal, the Board affirmed in a July 28, 2023, decision and order based on the WCJ's determinations of the witnesses' credibility and the weight of the evidence. *Id*. at 62-64. Claimant, now proceeding *pro se*, timely appealed to this Court.

## II. Issues & Parties' Arguments

In her petition for review, Claimant asserted that the WCJ and Board should not have credited Dr. Bennett's testimony of full recovery, which was inconsistent with that of Drs. Schneider and Gardner; that Dr. Schneider's distinction between routine activities and the more demanding duties of Claimant's job should have been credited by the WCJ in considering the evidence of Claimant's recovery; and that Dr. Bennett's role as the IME doctor for Employer's insurer should have damaged his credibility. Petition for Review at 1-4. Claimant reiterates these claims in her brief. Claimant's Br. at 2-5.

Employer responds that the WCJ's credibility determinations are supported by substantial competent evidence of record and based on multiple factors including the WCJ's personal observation of Claimant's testimony, Dr. Bennett's decades of experience and full-time clinical practice in neurology, Dr. Schmidt's

9

unrebutted testimony as to Claimant's physical recovery, and the discrepancies between Dr. Schneider's testimony and the basis for her referral to Dr. Gardner. Employer's Br. at 8-10.

### III. Discussion

In the claim petition context, it is the claimant's burden to prove the extent and duration of his or her disability.[2] *Sch. Dist. of Phila. v. Workers' Comp. Appeal Bd. (Hilton)*, 117 A.3d 232, 245 (Pa. 2015). If the WCJ concludes that the evidence supports a finding of disability only for a closed period, the WCJ "is free to make such a finding." *Connor v. Workmen's Comp. Appeal Bd. (Super Sucker, Inc.)*, 624 A.2d 757, 759 (Pa. Cmwlth. 1993). The employer need not formally file a petition to terminate the claimant's benefits if the evidence shows that the claimant is fully recovered from the work injury and any remaining disability is no longer the result of the work injury. *See Ohm v. Workmen's Comp. Appeal Bd. (Caloric Corp.)*, 663 A.2d 883, 885-86 (Pa. Cmwlth. 1995).

In this context, the WCJ, "as the ultimate finder of fact, has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part." *City of Phila. v. Workers' Comp. Appeal Bd. (Wilson)*, 767 A.2d 26, 29 (Pa. Cmwlth. 2001) (*Wilson*). "[G]reater credence may be given to the testimony of a treating physician than to a physician who examines simply to testify for litigation purposes"; however, such deference is not required of the WCJ. *D.P. "Herk"*

---

[2] Our review is limited to determining whether the WCJ's findings of fact are supported by substantial and competent evidence of record, whether an error of law was committed, or whether constitutional rights were violated. *DiLaqua v. City of Phila. Fire Dep't (Workers' Comp. Appeal Bd.)*, 268 A.3d 1, 4 n.5 (Pa. Cmwlth. 2021).

*Zimmerman, Jr., Inc. v. Workmen's Comp. Appeal Bd. (Himes)*, 519 A.2d 1077, 1080 (Pa. Cmwlth. 1987); *Sneddon v. Workers' Comp. Appeal Bd. (Am. Airlines, Inc.)* (Pa. Cmwlth., No. 278 C.D. 2020, filed Feb. 4, 2021), slip op. at 14-15, 2021 WL 394607, at *7 (unreported) (stating that the WCJ was not required to accept the claimant's treating doctor's opinion solely because of that status).

When both parties present evidence, "it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the WCJ, rather the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding." *Gen. Elec. Co. v. Workers' Comp. Appeal Bd. (Myers)*, 793 A.2d 191, 193 (Pa. Cmwlth. 2002). A reviewing court cannot reweigh the evidence or credibility of witnesses, but "must simply determine whether, upon consideration of the evidence as a whole, the [WCJ's] findings have the requisite measure of support in the record." *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993).

To ensure adequate appellate review, a WCJ must "adequately explain the reasons for rejecting or discrediting competent evidence." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transport)*, 828 A.2d 1043, 1052 (Pa. 2003) (internal citations omitted). In the context of depositions where the WCJ cannot personally observe the testimony for purposes of credibility determination, the WCJ must articulate some objective reason for the determination. *Id*. at 1053. There may be many such reasons, such as qualifications, consistency, greater or lesser interaction with the claimant, timing, or reliance on "erroneous factual assumptions" concerning the case. *Id*.

Here, there is no dispute that Claimant sustained a work-related head injury as a result of the May 18, 2021, incident. Claimant's appeal challenges the

11

WCJ's determination that as of December 20, 2021, the date of Claimant's IME with Dr. Schmidt, she was fully recovered and no longer eligible for benefits. The evidence regarding the duration of Claimant's injuries and disability consisted of her testimony, the testimony of the three doctors, Dr. Gardner's report, and the August 2021 surveillance video.

## A. Claimant's Testimony

The WCJ credited Claimant's testimony as it related to her sustaining a work-related traumatic brain injury as a result of the May 2021 incident. C.R. at 26. However, the WCJ did not credit Claimant's testimony as to the ongoing nature of her injury; in this regard, the WCJ specifically noted her personal observation of Claimant's July 2022 hearing testimony. *Id*. The WCJ explained that despite Claimant's assertion that she still had difficulty with word-finding and memory, her live testimony concerning her condition conflicted with other record evidence. The Board affirmed, noting deference to the WCJ's credibility determinations and no evidence of error. *Id*. at 62-63.

We agree as the record supports the WCJ's credibility determination regarding Claimant's testimony. Although Claimant's live testimony took place over six months after the date the WCJ ultimately ended Claimant's benefits, during the relevant period, Dr. Bennett reported that at the September 2021 in-person IME, Claimant was able to speak clearly and provide a detailed history to him and he detected no issues in his examination of her. C.R. at 489, 493, 497 & 503-04. Dr. Schmidt was only evaluating Claimant's physical injuries, but he also reported observing no cognitive issues. *Id*. at 453-44. The August 2021 surveillance video clock shows Claimant driving for over an hour, round-trip, to a yard sale without

12

apparent cognitive distress. Lastly, even though Claimant stated at her July 2022 testimony that her word-finding and memory problems worsened with stress, the WCJ detected no issues in Claimant's testimony, which was given under oath with the continuation of her benefits hanging in the balance. *Id*. at 26.

The WCJ has "exclusive province over questions of credibility and evidentiary weight and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part." *Wilson*, 767 A.2d at 29. When there is conflicting evidence, "the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding." *Gen. Elec. Co.*, 793 A.2d at 193. Here, the WCJ's evaluation of Claimant's testimony was supported by Dr. Bennett's testimony and, to a lesser degree, Dr. Schmidt's testimony and the surveillance video, which this Court observed. Although Claimant's testimony was generally supported by Dr. Schneider's testimony and the report of Dr. Gardner, the WCJ was not bound to credit their opinions and did not do so, as will be addressed. As such, Claimant has not shown error in the WCJ's determination that Claimant's testimony did not credibly support an ongoing disability.

## B. Medical Experts' Testimony

The WCJ credited Dr. Bennett's testimony over Dr. Schneider's testimony, citing Dr. Bennett's decades of clinical experience and his ability to evaluate Claimant in person compared with Dr. Schneider's shorter career, primary focus on research, and the limitations of only seeing Claimant via telehealth. C.R. at 26. The WCJ did not credit Dr. Gardner's report, based on discrepancies between the report's stated basis for Dr. Schneider's referral and the issues Dr. Schneider discussed in her testimony. *Id*. at 26-27. The WCJ credited Dr. Schmidt's

13

unrebutted testimony as to Claimant's physical condition. *Id*. at 27. The Board affirmed, noting its deference to the WCJ's credibility determinations and no evidence of error. *Id*. at 62-63.

We agree, as the record supports the WCJ's credibility determinations regarding the medical evidence. Dr. Schneider has been a licensed neurologist for 10 years and 80% of her work is research-based. C.R. at 251-54 & 313-14. She acknowledged that she saw Claimant only through telehealth, which Dr. Schneider admitted presented "limitations" in that some "subtleties" can be missed. *Id*. at 269. She had personally seen Claimant only twice prior to her deposition. *Id*. at 281 & 292. By contrast, Dr. Bennett has been a licensed neurologist for over 40 years and maintains a full-time clinical practice. *Id*. at 479. He saw Claimant only once for the IME, but that examination took place in person and he was able to conduct a physical evaluation and directly observe and interact with her. *Id*. at 484.

Qualifications and greater or lesser interaction with the patient are among the generally accepted reasons that a WCJ may credit or reject a medical expert's testimony. *Daniels*, 828 A.2d at 1053. Dr. Schneider is Claimant's treating doctor, but the WCJ was not bound by that status alone to credit Dr. Schneider over Dr. Bennett. *D.P. "Herk" Zimmerman, Jr., Inc.*, 519 A.2d at 1080; *Sneddon*, slip op. at 14-15, 2021 WL 394607, at *7. As such, the WCJ did not err in giving greater credence to Dr. Bennett's testimony based on his lengthier tenure, more patient-oriented practice, and personal observation of Claimant, particularly where both doctors testified as to telehealth's limitations.

Regarding Dr. Gardner's neuropsychological evaluation report, the WCJ correctly noted that Dr. Schneider's referral basis, included in the report, cited Claimant being jumpy, anxious, and sensitive to noises, but that in Dr. Schneider's

14

testimony, she did not include these in her recounting of Claimant's symptoms. C.R. at 26-27 & 391. This suggests the kind of "erroneous factual assumptions" that a WCJ may consider in this context. *Daniels*, 828 A.2d at 1052-53. The discrepancy here is not necessarily dispositive, and a WCJ may accept reports without corresponding testimony when the potential benefit period is less than one year. *See* 77 P.S. § 835.[3] However, where there is live medical expert testimony with the opportunity for cross-examination and more targeted questioning, the WCJ may credit the live testimony over another medical expert's report. *See Wilson*, 767 A.2d at 29. As such, the WCJ did not err in giving less credence to Dr. Gardner's report.

The WCJ also did not err in fully crediting Dr. Schmidt's testimony that Claimant was physically fully recovered as of the December 2021 IME. C.R. at 26 & 449-50; *Wilson*, 767 A.2d at 29; *D.P. "Herk" Zimmerman, Jr., Inc.*, 519 A.2d at 1080. Claimant did not rebut that opinion and even stated in her July 2022 hearing that she believed she was physically able by that time to resume her work but for her ongoing cognitive issues. C.R. at 100-01. Given the foregoing, the WCJ did not err in concluding that based on the medical evidence, Claimant had fully recovered from her disabling work-related injuries as of the latter IME in this case by Dr. Schmidt in December 2021.

### C. Video Surveillance

This Court has held that although surveillance evidence alone is not sufficient to satisfy a party's burden, it may be used "to impeach credibility and to establish facts" in a case. *Soja v. Workers' Comp. Appeal Bd. (Hillis-Carnes Eng'g Assocs.)*, 33 A.3d 702, 706-08 (Pa. Cmwlth. 2011). The record includes roughly 30

---

[3] Section 422(c) of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. 835.

minutes of video surveillance taken of Claimant on selected dates in August and September of 2021, within the relevant period. Claimant is shown driving, getting in and out of her car, walking, shopping, and carrying a tray of beverages.

Dr. Schneider downplayed the video because, to her, it showed Claimant doing relatively simple and occasional activities of daily living and it was not comparable to the kind of sustained high-functioning and multitasking allegedly required in Claimant's work. C.R. at 303. Dr. Bennett's impression of the video was that even relatively simple and common activities require a degree of cognitive functioning, and the video showed no evidence of impairment at all in Claimant's actions outside of the courtroom or medical office; she was not even wearing sunglasses to help with her reported light sensitivity. *Id*. at 500-01, 512 & 525.

The WCJ also viewed the video and concluded that Claimant's lack of any evident cognitive issues in the video conflicted with her testimony of ongoing impairment, just as her testimony itself showed no such impairment. C.R. at 26. The WCJ was within her province to conclude that the video evidence impeached Claimant's testimony and contributed to a factual determination that as of December 2021, Claimant was no longer disabled, and this Court discerns no error in that evaluation and conclusion. *See Soja*, 33 A.3d at 706-08; *see also Gen. Elec. Co.*, 793 A.2d at 193.

## IV. Conclusion

The WCJ's December 16, 2022, determination that Claimant sustained a disabling work-related head injury on May 18, 2021, and that she recovered from that injury as of December 20, 2021, is supported by substantial record evidence.

16

Claimant has not met her burden to refute the WCJ's conclusions, which the Board affirmed. Accordingly, the Board's July 28, 2023, order is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Joan Cassidy, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Presbyterian Medical Center of the | : | |
| University of Pennsylvania Health | : | |
| System (Workers' Compensation | : | |
| Appeal Board), | : | No. 1023 C.D. 2023 |
| Respondent | : | |

# **O R D E R**

AND NOW, this 2nd day of June, 2025, the July 28, 2023, order of the Workers' Compensation Appeal Board is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge